UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------

NEW YORK SMSA LIMITED PARTNERSHIP d/b/a
VERIZON WIRELESS, NEW CINGULAR WIRELESS
PCS, LLC, SPRING SPECTRUM, L.P., and
OMNIPOINT COMMUNICATIONS, INC., a wholly
owned subsidiary of T-MOBILE USA, INC.        07 Civ 7637 (WGY)

            Plaintiffs,

                                              Memorandum and Order

            -against-

TOWN OF CLARKSTOWN, and THE TOWN
BOARD OF THE TOWN OF CLARKSTOWN,

                    Defendants.
-----------------------------------------

WILLIAM G. YOUNG, United States District Judge.[1]

    On February 1, 1996, Congress enacted the Telecommunications

Act of 1996 ("Telecommunications Act"), Pub. L. No. 104-104, 110

Stat. 56 (codified at 47 U.S.C. §§ 151 et seq., as amended),

which made substantial changes to Federal regulation of

telecommunications in order to facilitate the spread of new

technologies nationwide. H.R. Conf. Rep. No. 104-458, at 113

(1996), reprinted in 1996 U.S.C.C.A.N. 10. Recognizing that

telecommunications technologies, which were once tightly

compartmentalized, were beginning to converge, see Thomas G.

Krattenmaker, The Telecommunications Act of 1996, 29 Conn. L.

Rev. 123, 127 (1996), Congress sought to abolish artificial

distinctions among signal delivery methods and "provide for a

pro-competitive, deregulatory national policy framework . . . by

-----

[1] Of the District of Massachusetts, sitting by designation.

1

opening all telecommunications markets to competition." H.R. Conf. Rep. No. 104-458, at 113.[2]

Personal wireless service was one of the "advanced telecommunications technologies" for which Congress sought "to accelerate rapidly private sector deployment." H.R. Conf. Rep. No. 104-458 at 113; see 47 U.S.C. § 332(c)(7).[3] Wireless service depends on a network of facilities of sufficient height, the siting of which often is hotly debated in local communities.[4] To

---

[2] For example, then-Senator Larry Pressler, as Chairman of the Senate Committee on Commerce, Science and Transportation, the principal spokesperson for the proposed law, explained:

Telecommunications policy in America, under the 1934 Communications Act, has long been based on the now faulty premise that information transmitted over wires could be easily distinguished from information transmitted over the air. Different regulatory regimes were erected around these different information media.

. . .

We can no longer keep trying to fit everything into the old traditional regulatory boxes--unless we want to incur unacceptable economic costs, competitiveness losses, and deny American consumers access to the latest products and services.

141 Cong. Rec. S7885-86 (daily ed. June 7, 1995) (statement of Sen. Pressler) (quoted in Monroe E. Price & John F. Duffy, Technological Change and Doctrinal Persistence: Telecommunications Reform in Congress and the Court, 97 Colum. L. Rev. 976, 982-83 (1997).

[3] Unless otherwise indicated, all citations to the United States Code are to Title 47.

[4] There is a NIMBY (not in my backyard) problem with regard to these towers. While everyone wants good cell service, homeowners are concerned about the effect of the unsightly structures on property values. See Steven J. Eagle, Wireless Telecommunications, Infrastructure Security, and the NIMBY Problem, 54 Cath. U. L. Rev. 445, 455-56 (2005).

2

facilitate the spread of this technology, the Telecommunications Act imposes procedural and substantive obligations on local zoning authorities, as set out in full in the margin.[5] It provides that local regulation may not "unreasonably discriminate" among personal wireless service providers, nor may it "prohibit or have the effect of prohibiting" the provision of personal wireless services. 47 U.S.C. § 332(c)(7)(B)(i)(II). Any decision to deny an application for a facility must be "in

─── ── ──── ────

[5] Title 47 U.S.C. § 332 (c)(7) provides, in relevant part:

Preservation of local zoning authority

(A) General authority

Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.

(B) Limitations

(i) The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof--

(I) shall not unreasonably discriminate among providers of functionally equivalent services; and

(II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.

(ii) A State or local government or instrumentality thereof shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request.

(iii) Any decision by a State or local government or instrumentality thereof to deny a request . . . shall be in writing and supported by substantial evidence contained in a written record.

3

writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii). Other than as delineated in section 332(c)(7)(B), the Telecommunications Act does not "limit or affect" State or local authority with respect to zoning and land use issues. See 47 U.S.C. § 332(c)(7)(A).

The central issue in this case is whether the Telecommunications Act expressly or impliedly preempts, under the Supremacy Clause of the United States Constitution, a local law enacted by the Town of Clarkstown ("Town") establishing a rigorous application and evaluation process for requests to install, modify, or renew permits for wireless telecommunications facilities. See Chapter 251 of the Clarkstown Town Code, as amended by Local Law No. 14, enacted July 26, 2007 ("Chapter 251") [Doc. No. 30 Attachment 3]. Chapter 251's stated purpose is:

    to provide the Town of Clarkstown the authority to
    accommodate and regulate the necessary utility
    infrastructure for the provision of wireless
    telecommunications facilities within the Town . . . , to
    encourage the siting of wireless telecommunications
    facilities in nonresidential areas on existing structures,
    to address the safety, visual and aesthetic aspects of . . .
    facilities and to provide for public input in the process of
    siting . . . towers.

Chapter 251 § 251-10(B). A further purpose is to "establish clear standards for the review and siting of . . . facilities." Id. The law declares the protection of residential areas from "unsightly" and "intrusive" facilities to be "of paramount importance" and provides that the town planning board must satisfy itself, before issuing a special permit for a wireless

4

facility in a residential area, "that all other alternatives have been exhausted." Id. section 251-10(D).

To achieve its purpose, Chapter 251 establishes a multi-stage application process, starting with an initial "preapplication" stage during which an applicant must submit several pieces of information to the planning board of the Town ("Planning Board"), including, inter alia, a topographic map of the proposed site location, a diagram of the proposed site showing all lot lines and the proposed facility, the number, type and design of the antenna(s) proposed, and signal propagation or coverage maps of existing facilities around the site. Chapter 251 § 251-13. With this information and a screening value calculated through use of a preliminary site screening tool that scores criteria including aesthetic and safety impacts and landscaping, see section 251-14; Chapter 251 Table 1, the Planning Board sorts pre-applications into four categories, "A" through "D." Id. section 251-15(A).

From the applicant's perspective, Category A is best -- pre-applications in this category require only Planning Board approval on aesthetic considerations, while those assigned a different category must complete a further, rigorous process to obtain a special use permit. Section 251-15(C). To obtain Category A status, a proposed facility must use a "preferred alternate technology" or be located on an existing site, and must have an acceptable minimum screening value. For example, a

5

proposed facility using Distributed Antenna System (DAS),[6] which is a "preferred alternate technology," see sections 251-15, 251-42, receives Category A assignment if it has a screening value of just sixty or greater, whereas a proposed co-location at an existing wireless facility or on a rooftop requires a screening value greater than 105.  See sections 251-15(A)(1), 251-42. Regardless of category assignment, several provisions of Chapter 251, discussed in more detail below, require applicants to provide information about Radio Frequency (RF)[7] interference and emissions.

Chapter 251 also sets out procedural requirements for the timing of the Planning Board's decisions and for fees.  For example, the Planning Board must hold a public hearing within sixty-two days of submission of each formal application and either approve, approve with conditions, or disapprove each within sixty-two days after the hearing.  Section 251-18(C-D). Chapter 251 establishes fixed application fees and requires applicants to provide funds to an escrow account "to allow the Town to retain such technical experts involving radio frequency as may be necessary to review the application."  Section 251-40.

The plaintiffs contend that Chapter 251 is preempted by the explicit text of the Telecommunications Act, as well as by the

---

[6] DAS "involves placing low power antennas on utility poles and streetlights."  Plaintiffs' Memorandum [Doc. 26] at 37.

[7] Chapter 251 defines Radio Frequency (RF) as "high frequency waves utilized in wireless systems to facilitate the propagation of information from one location to another." Chapter 251 § 251-42.

6

implied intent of Congress.

## I.   PROCEDURAL HISTORY

Without having filed any application for a permit pursuant
to Chapter 251, the plaintiffs, New York SMSA Limited Partnership
d/b/a Verizon Wireless, New Cingular Wireless PCS, LLC, Sprint
Spectrum L.P., and Omnipoint Communications, Inc., a wholly owned
subsidiary of T-Mobile USA, Inc., four national wireless
telecommunications service providers (collectively, "the
Carriers"), filed this Complaint [Doc. No. 1] on August 28, 2007.
On January 11, 2008, they moved for summary judgment [Doc. No.
25], supported by a memorandum of law ("Pls. Mem.") [Doc. No.
26].

On March 17, 2008, the Town filed a cross motion for summary
judgment [Doc. No. 30] and a memorandum of law in support ("Town
Mem.") [Doc. No. 32], accompanied by a Local Rule 56.1 statement
("Town Facts") [Doc. No. 30 Attachment 1] and several
declarations and exhibits [Doc. No. 30 Attachments 2 through 10
and Doc. No. 34]. The Carriers opposed the Town's motion ("Pls.
Opp'n") [Doc. No. 33] and submitted a response to the Town's
Local Rule 56.1 statement ("Pls. Facts") [Doc. No. 33 Attachment
2]. The Town replied on May 9, 2008 ("Town Reply") [Doc. No.
35]. After the case was reassigned to this Court on December 1,
2008, the parties agreed to proceed as a case stated. By so
agreeing, the parties have stipulated to a record for decision.
The Court may decide any significant issues of material fact and
draw all reasonable inferences from the record. See E.G. v. City

Sch. Dist. of New Rochelle, No. 07-02696-WGY, slip. op. at 1 n.2 (S.D.N.Y. March 19, 2009). See also Boston Five Cents Sav. Bank v. Secretary of Dept. of Housing and Urban Development, 768 F.2d 5, 11-12 (1st Cir. 1985) (Breyer, J.); Dickerson v. Prudential Life Ins. Co. of America, 574 F. Supp. 2d 239, 241 (D. Mass. 2008).

## II. RULINGS OF LAW

Because the parties have stipulated to a record for decision, the Court may proceed directly to its Rulings of Law. Fed. R. Civ. P. 52 (a)(1).

As the United States Supreme Court recently emphasized in Altria Group, Inc. v. Good, 129 S. Ct. 538, 543 (2008), "the purpose of Congress is the ultimate touchstone in every pre-emption case," and it may be indicated either expressly or by implication.[8] Id. (internal quotations omitted); Jones v. Rath Packing Co., 430 U.S. 519, 525 (1977); Clearing House Ass'n v. Cuomo, 510 F.3d 105, 113 (2d Cir. 2007) ("Preemption can generally occur in three ways: where Congress has expressly preempted state law, where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law, or where federal law conflicts with state law." (quoting Wachovia Bank, N.A. v. Burke, 414 F.3d 305, 313 (2d Cir. 2005))). The Carriers rely on every

---

[8] For purposes of the Supremacy Clause, "the constitutionality of local ordinances is analyzed in the same way as that of statewide laws." Hillsborough County v. Automated Medical Lab., Inc., 471 U.S. 707, 712-14 (1985).

theory of preemption, arguing: Chapter 251 effectively prohibits the provision of wireless services, in violation of the explicit preemptive text of the Telecommunications Act; it "treads on a field completely occupied by federal law," Pls. Reply at 5; and it "conflicts with and frustrates valid policy decisions made by the [Federal Communications Commission] FCC pursuant to its exclusive regulatory authority." Id. at 10. After resolving one preliminary matter, the Court addresses the Carriers' implied preemption arguments.

Where the subject of the federal provision at issue is one traditionally within the purview of State and local government, federal law will not preempt unless that is the "clear and manifest" intent of Congress. Altria Group, Inc., 129 S. Ct. at 543 ("When addressing questions of express or implied pre-emption, we begin our analysis 'with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)); Jones, 430 U.S. at 525. See also San Diego Bldg. Trades Council v. Garmon, 359 U.S. 236, 243-44 (1959) ("due regard for the presuppositions of our embracing federal system . . . has required us not to find withdrawal from the States of power to regulate . . . where the regulated conduct touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the

9

power to act."). In such cases, courts apply a presumption
against preemption: "when the text of a pre-emption clause is
susceptible of more than one plausible reading, courts ordinarily
'accept the reading that disfavors pre-emption.'" Altria Group,
Inc., 129 S. Ct. at 543 (quoting Bates v. Dow Agrosciences LLC,
544 U.S. 431, 449 (2005)).[9]

The Supreme Court has explained, however, that when a state
regulates in an area "where there has been a history of
significant federal presence," the presumption is not triggered.
United States v. Locke, 529 U.S. 89, 108 (2000) (refusing to
apply presumption in favor of state laws bearing upon national
and international maritime commerce). See also Ting v. AT&T, 319
F.3d 1126, 1136 (9th Cir. 2003) (refusing to apply presumption in
favor of state contract and consumer protection laws with regard
to preemption by the Telecommunications Act "because of the long
history of federal presence in regulating long-distance
telecommunications"). That precedent has been brought into
question by the Supreme Court's recent decision in Wyeth v.
Levine, No. 06-1249, 2009 WL 529172, at *5 n.3 (March 04, 2009),
where the court concluded, over the objections of a
pharmaceutical company, that a state failure-to-warn jury verdict
was entitled to the presumption against preemption even though

---

[9] Justice Thomas, in dissent, joined by Chief Justice
Roberts and Justices Scalia and Alito, attacked the majority's
reliance on a presumption against preemption, concluding that
"[i]n light of Riegel [v. Medtronic, Inc., 128 S.Ct. 999 (2008)],
there is no authority for invoking the presumption against
pre-emption in express pre-emption cases." Altria Group, Inc.,
129 S. Ct. at 558 (Thomas, J., dissenting).

10

the Federal government has regulated drug labeling for more than
a century. The Supreme Court explained that it relied on the
presumption "because respect for the States as 'independent
sovereigns in our federal system' leads [it] to assume that
'Congress does not cavalierly pre-empt state-law causes of
action.'" Id. (quoting Medtronic, Inc. v. Lohr, 518 U.S. 470, 485
(1996)). The Supreme Court observed: "The presumption thus
accounts for the historic presence of state law but does not rely
on the absence of federal regulation." Id.

        Because Wyeth and Lohr involved state-law causes of action
whereas Locke involved local regulation, there is a question
whether the presumption against preemption applies here, and the
parties have not addressed the issue. While there is no doubt
that zoning traditionally is a local matter, see Murphy v. New
Milford Zoning Comm'n, 402 F.3d 342, 348 (2d Cir. 2005) ("land
use disputes are uniquely matters of local concern more aptly
suited for local resolution"), as discussed below there are
provisions of Chapter 251 that regulate in an area of significant
federal presence -- telecommunications technology. Therefore the
Court will apply the presumption only with respect to the
provisions soundly within the Town's traditional police powers,
i.e., substantive requirements pertaining to aesthetics, height,
setback, and distance, and procedural requirements in the nature
of deadlines and fees.

## A.   Implied Preemption

        Even where, as here, Congress expressly has indicated its

11

pre-emptive intent, the Court must look further and also make a determination of implied pre-emption. See Altria Group, Inc., 129 S. Ct. at 543.[10] The Carriers challenge several provisions of Chapter 251 that impose, in their words, "technical and operational standards" on wireless carriers, arguing that the provisions are preempted because federal regulation occupies the field, see Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947) ("The scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it"), or because the provisions create an unacceptable "obstacle to the accomplishment and execution of

_____

[10] As the Supreme Court explained in Altria Group, Inc.:

> If a federal law contains an express pre-emption clause, it does not immediately end the inquiry because the question of the substance and scope of Congress' displacement of state law still remains. Pre-emptive intent may also be inferred if the scope of the statute indicates that Congress intended federal law to occupy the legislative field, or if there is an actual conflict between state and federal law.

129 S. Ct. at 543 (internal citations omitted). In other words, a court may consider implied preemption even where there is an express preemption clause. Compare Medtronic, Inc. v. Lohr, 518 U.S. 470, 484-85 (1996)("the pre-emptive language of [the federal act] means that we need not go beyond that language to determine whether Congress intended the [federal act] to pre-empt at least some state law"), and Cipollone v. Liggett Group, Inc., 505 U.S. 504, 517 (1992) ("When Congress has considered the issue of pre-emption and has included in the enacted legislation a provision explicitly addressing that issue, . . . we need only identify the domain expressly pre-empted by [that provision]."), with Boggs v. Boggs, 520 U.S. 833, 841 (1997) (deciding that ERISA preempts conflicting state law, but not relying on ERISA's express preemption clause to reach that result). See also Freightliner Corp. v. Myrnick, 514 U.S. 280, 289 (1995) ("At best, Cipollone supports an inference that an express pre-emption clause forecloses implied pre-emption; it does not establish a rule.").

12

the full purposes and objectives of Congress," Hines v.
Davidowitz, 312 U.S. 52, 67 (1941). Specifically, the Carriers
challenge Chapter 251's requirement that applicants submit
information pertaining to the Radio Frequency (RF) interference
created by proposed facilities, its preference for alternate
technologies, and its mandated submission of coverage maps
demonstrating a certain minimum signal strength.

          1.    Provisions Pertaining to Radio Frequency
              Interference

"Radio frequency interference . . . arises when a signal
radiation by a transmitter is picked up by an electronic device
in such a manner that it prevents the clear reception of another
and desired signal or causes malfunction of some other electronic
device." H.R. Conf. Rep. No. 97-765, at 21 (1982), reprinted in
1982 U.S.C.C.A.N. 2261, 2265. Chapter 251 addresses this
concern, requiring certain classes of applicants to certify that
their proposed facilities will not cause RF interference: for
example, Category B, C, and D applications must include
certification that their proposed antennas "will not cause
interference with existing telecommunications devices," section
251-19(F)(24), and applicants seeking to build new towers must
demonstrate that the reception "for nearby properties will not be
disturbed or diminished." Section 251-22(A)(3). Furthermore,
section 251-11(E)(7) exempts certain applications from the
rigorous screening process set out later in the chapter and
provides for their approval by the town building inspector upon
compliance with, inter alia, a requirement that the proposed

equipment "not cause interference with existing equipment."

The Second Circuit has determined that "Congress intended that the FCC enjoy exclusive jurisdiction to regulate RF interference phenomena," as a result of which "federal law has preempted the field of RF interference regulation." Freeman v. Burlington Broadcasters, Inc., 204 F.3d 311, 321 (2d Cir. 2000). In Freeman, a zoning board issued a permit for construction and use of a radio transmission tower on the express condition that "any interference with reception in homes in the area because [the permit holders] began broadcasting will be remedied by [the permit holders]." Id. at 315. When the town zoning administrator issued a notice of violation to the permit holders in response to a considerable number of RF interference complaints by neighboring residents, the zoning board concluded that its authority to enforce the permit condition was preempted by the federal government's occupation of the field of RF interference regulation. Id. at 315. The Second Circuit examined the FCC's statutory authority to regulate radio broadcasting, pointing to several statutory provisions that "make it clear that Congress intended the FCC to possess exclusive authority over technical matters related to radio broadcasting." Id. at 320. The FCC has statutory authority to "make reasonable regulations . . . governing the interference potential of devices which in their operation are capable of emitting radio frequency . . . in sufficient degree to cause harmful interference to radio communications." 47 U.S.C. § 302(a). The Freeman court studied

14

the legislative history of that amendment, reviewing a 1982 House

Conference Report that explained the amendment was intended to:

> clarify the reservation of exclusive jurisdiction to the
> Federal Communications Commission over matters involving RFI
> [radio frequency interference]. Such matters shall not be
> regulated by local or state law, nor shall radio
> transmitting apparatus be subject to local or state
> regulation as part of any effort to resolve an RFI
> complaint. The Conferees believe that radio transmitter
> operators should not be subject to fines, forfeitures, or
> other liability imposed by any local or state authority as a
> result of interference appearing in home electronic
> equipment or systems. Rather, the Conferees intend that
> regulation of RFI phenomena shall be imposed only by the
> Commission.

1982 U.S.C.C.A.N. 2237, 2277 (also quoted in Broyde v. Gotham

Tower, Inc., 13 F.3d 994, 997-98 (6th Cir. 1994) (concluding that

state common law action to remedy nuisance caused by radio signal

interference was preempted)).

The Freeman court next examined the FCC's regulation of RFI

through rulemaking, which the FCC had done "extensively," as well

as through adjudicatory decisions in favor of federal preemption,

and concluded that both were entitled to deference.  204 F.3d at

321-22.  The court's analysis led to the ultimate conclusion that

"allowing local zoning authorities to condition construction and

use permits on any requirement to eliminate or remedy RF

interference stands as an obstacle to the accomplishment and

execution of the full purposes and objectives of Congress . . .

in delegating regulatory power to the FCC for uniform regulation

of broadcast technologies."  Id. at 325 (internal citations and

15

quotation marks omitted).[11]

In light of the Freeman decision, there can be no serious dispute but that the above provisions of Chapter 251 are impliedly preempted. This Court will not belabor the point.

> 2. Provisions Giving Preference to "Alternate" Technologies

Since passage of the initial Communications Act in 1934, the Federal government has wielded exclusive authority over the granting of licenses for telecommunications providers: "It is the purpose of this chapter, among other things, to maintain the control of the United States over all the channels of radio transmission; and to provide for the use of such channels, but not the ownership thereof, by persons for limited periods of time, under licenses granted by Federal authority, and no such license shall be construed to create any right, beyond the terms, conditions, and periods of the license." 48 Stat. 1064, as amended, 47 U.S.C. § 301 (emphasis added). Through the enactment, Congress, motivated by "a widespread fear that in the absence of governmental control a public interest might be subordinated to monopolistic domination in the broadcasting field," Federal Communications Commission v. Pottsville Broadcasting Co., 309 U.S. 134, 137 (1940), sought to "centraliz[e] authority" in a newly created FCC and to "make available" a "rapid, efficient, Nation-wide, and world-wide wire

---

[11] The Second Circuit also concluded, in response to the homeowners' arguments, that "Congress did not intend by [47 U.S.C. § 332(c)(7)(A)] to repeal the FCC's exclusive jurisdiction over RF interference complaints." 204 F.3d at 323.

16

and radio communication service with adequate facilities at reasonable charges." 47 U.S.C. § 151.[12]  See also National Broadcasting Co. v. United States, 319 U.S. 190, 217 (1943) ("The avowed aim of the Communications Act of 1934 was to secure the maximum benefits of radio to all the people of the United States."); Pottsville, 309 U.S. at 137 ("By this [1934] Act Congress, in order to protect the national interest involved in the new and far-reaching science of broadcasting, formulated a unified and comprehensive regulatory system for the industry."). Toward this end, Congress empowered the FCC to "make such distribution of licenses, frequencies, hours of operation, and of power among the several States and communities as to provide a fair, efficient, and equitable distribution of radio service to each," section 307(b).  More specifically, the FCC is empowered,

---

[12] Title 47 U.S.C. § 151 provides:

For the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States, without discrimination on the basis of race, color, religion, national origin, or sex, a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, for the purpose of the national defense, for the purpose of promoting safety of life and property through the use of wire and radio communications, and for the purpose of securing a more effective execution of this policy by centralizing authority heretofore granted by law to several agencies and by granting additional authority with respect to interstate and foreign commerce in wire and radio communication, there is created a commission to be known as the "Federal Communications Commission", which shall be constituted as hereinafter provided, and which shall execute and enforce the provisions of this chapter.

The provisions pertaining to discrimination were added by the 1996 Amendments, Pub. L. No. 104-104, § 104.

inter alia, to "[c]lassify radio stations," "[a]ssign bands of frequencies to the various classes of stations," "regulate the kind of apparatus to be used with respect to its external effects and the purity and sharpness of the emissions from each station and from the apparatus therein," and "[s]tudy new uses for radio, provide for experimental uses of frequencies, and generally encourage the larger and more effective use of radio in the public interest." Section 303. It has the power to "[m]ake such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary." Id.

In passing the 1996 amendments to the Telecommunications Act, including those pertaining to personal wireless services, see section 332, Congress had a slightly different purpose: to encourage competition and facilitate the spread of new technologies. H.R. Conf. Rep. No. 104-458, at 113. Local authority was not completely sacrificed, however. As the Second Circuit has explained, the Telecommunications Act, as amended in 1996, "strikes a balance between 'two competing aims -- to facilitate nationally the growth of wireless telephone service and to maintain substantial local control over siting of towers.'" Omnipoint Commc'ns, Inc. v. City of White Plains, 430 F.3d 529, 531 (2d Cir. 2005) (quoting Town of Amherst, N.H. v. Omnipoint Commc'ns Enters., Inc., 173 F.3d 9, 13 (1st Cir. 1999)). See also ATC Realty, LLC v. Town of Kingston, 303 F.3d 91, 94 (1st Cir. 2002) (Section 704 "works like a scale that . . . attempts to balance two objects of competing weight: on one arm

18

sits the need to accelerate the deployment of telecommunications technology, while on the other arm rests the desire to preserve state and local control over zoning matters.").

Pursuant to Congress's explicit delegation, the FCC has used its rule-making power to regulate "technical requirements for use of the spectrum and equipment in the personal communications services."[13] 47 C.F.R. § 24.50. The FCC regulates equipment authorization for this type of wireless service, requiring that each transmitter is "of a type that has been authorized by the Commission under its certification procedure for use under this part." Id. section 24.51. Applicants for equipment authorization are required to submit statements confirming compliance with the FCC's radiofrequency radiation exposure requirements. See id. sections 24.51-24.52. The rules also govern the calculation of an antenna's height above average terrain, see id. section 24.53, and the marking and lighting of antenna structures. See id. section 24.55. The FCC similarly has made rules pertaining to satellite communications, see 47 C.F.R. Ch. I, Subch. B, Pt. 25, and other miscellaneous wireless communications services, see 47 C.F.R. Ch. I, Subch. B, Pt. 27.

This backdrop of federal regulation of the technical standards of wireless technology gives rise to the Carriers' argument that Chapter 251's preference for alternate technologies over other technologies that have been authorized by the FCC is

---

[13] For purposes of the Telecommunications Act, personal communications services fall within the larger class of personal wireless services. See 47 U.S.C. §§ 332(c)(7)(C)(i), (d)(1).

19

preempted because federal law "occupies the field when it comes to technical and operational aspects of wireless service." Pls. Mem. at 33. The Town characterizes this as "beyond the realm of legitimate argument," pointing out that courts in the Second Circuit explicitly have ruled that towns may make wireless facility siting decisions based in part on preferences for less invasive structures and technologies. Town Reply at 17.

A town plainly may not impose separate, stricter certification requirements for wireless technology than those set forth by the FCC. Federal law has preempted the field of technology authorization and station licensing, and there is no room for state and local authorities to regulate in these areas. Something slightly different is at issue in this case, however. The Town argues that it merely has codified the weighing of interests that it lawfully may do with respect to any individual siting application. It relies on decisions including Sprint Spectrum L.P. v. Willoth, 176 F.3d 630 (2d Cir. 1999), and Omnipoint Communications v. City of White Plains, 430 F.3d 529 (2d Cir. 2005), where the Second Circuit reviewed town planning boards' denials of requests for permits and determined whether the decisions effectively prohibited the provision of wireless services or unreasonably discriminated between wireless providers. See 47 U.S.C. § 332(c)(7)(i)(I) and (II). Those decisions explicitly recognized that a town may require applicants to employ the least intrusive means for the provision of services. In Willoth, for example, the Second Circuit held

20

that a town planning board did not violate the Telecommunications
Act when it rejected a wireless provider's application on the
grounds that fewer towers were required to provide coverage.  176
F.3d at 644.  The court explained: a "local government may reject
an application for construction of a wireless service facility in
an under-served area without thereby prohibiting personal
wireless services if the service gap can be closed by less
intrusive means," i.e., means that "limit the aesthetic impact of
a cell site."  Id. at 643.  For example, an applicant may be
required to "select a less sensitive site," "reduce the tower
height," or "use a preexisting structure."  Id.  See also New York
SMSA Ltd. P'ship v. Town of Clarkstown, 99 F. Supp. 2d. 381, 389
(S.D.N.Y. 2000) (McMahon, J.) ("A local government is entitled to
choose one wireless carrier or monopole builder over another, as
long as the decision is not discriminatory.  The
[Telecommunications Act] was enacted to promote competition, and
as long as the losing carrier is able to minimize the gap in its
coverage through co-location or alternative sites, the
[Telecommunications Act's] prohibition against denying wireless
services is not implicated.").

     It appears that the wireless carriers in Willoth and
Omnipoint never argued field preemption, even though the denials
of their applications certainly constituted "regulation"
susceptible to preemption.  Regardless, those cases are different
from the one before this Court.  There, the planning boards
examined aesthetic concerns with regard to applications setting

21

forth specific technologies to be used on specific sites, whereas here the Town Planning Board legislated a preference for certain technologies regardless of site location. Because this preference interferes with the FCC's regulatory scheme, these provisions of Chapter 251 are preempted by federal law.

As the Ninth Circuit explained in Metro PCS, Inc. v. City and County of San Francisco, 400 F.3d 715, 736 (9th Cir. 2005), "[e]ssentially, the [Telecommunications Act] represents a congressional judgment that local zoning decisions harmless to the FCC's greater regulatory scheme - and only those proven to be harmless - should be allowed to stand." See also Freeman, 204 F.3d at 323 (observing that section 332(c)(7)(A) "is most reasonably understood as permitting localities to exercise zoning power based on matters not directly regulated by the FCC."). Here, the Town's legislated preference for alternate technologies interferes with the Telecommunications Act's pervasive scheme in a way that individual permit decisions such as those in Willoth and Omnipoint do not. See GTE Mobilnet of South Texas Ltd. P'ship v. Pascouet, 61 S.W.3d 599 (Tex. App. Houston 14th Dist. 2001) (holding that while the field of RF interference was preempted, a state common law nuisance claim based on a typical zoning concern, tower height, was not). See also Pacific Gas & Elec. Co. v. State Energy Res. Conservation, 461 U.S. 190, 203 (1983) (concluding that local moratorium on construction of nuclear power plants "lies outside the occupied field of nuclear safety regulation" because it is grounded in economic rather than

safety concerns).

For the sake of completeness, the Court addresses a further argument made by the Carriers: that the "FCC itself repeatedly has asserted its broad and exclusive control over technical and operation issues in a range of contexts related to wireless services." Pls. Mem. at 34. There is no doubt that "an agency regulation with the force of law can pre-empt conflicting state requirements." Wyeth v. Levine, No. 06-1249, 2009 WL 529172, at *11. When an agency does not have express authorization to preempt state law, however, the weight accorded to its "explanation of state law's impact on the federal scheme depends on its thoroughness, consistency, and persuasiveness." Id. (concluding that preamble to Food and Drug Administration regulation "does not merit deference"). There is a question in this case whether the FCC has the authority to preempt local laws such as Chapter 251. There is an express preemption provision in 47 U.S.C. §§ 253(a), (d), authorizing the FCC to pre-empt "any [local] statute, regulation, or legal requirement" that "may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." With respect to 47 U.S.C. § 332 (c)(7), however, Congress intended that the courts have "exclusive jurisdiction" over all disputes other than those pertaining to RF emissions.[14]

---

[14] 47 U.S.C. § 332 (c)(7)(B)(v) provides: "Any person adversely affected by an act or failure to act by a State or local government or any instrumentality thereof that is inconsistent with clause (iv) may petition the Commission for relief." Clause (iv) provides: "No State or local government or

23

H.R. Conf. Rep. No. 104-458, at 209.  The 1996 Conference Report
explicitly provided:  "Any pending Commission rulemaking
concerning the preemption of local zoning authority over the
placement, construction or modification of CMS [commercial mobile
services] facilities should be terminated."  Id.

The FCC has not submitted an amicus brief or otherwise
weighed in on this case.  Instead, the Carriers point to several
reports issued by the FCC discussing the scope of preemption of
local regulation of wireless technological standards, all of
which were issued before the 1996 amendments to the
Telecommunications Act.[15]  In one report, issued after notice and
comment, the FCC asserted "federal primacy over the areas of
technical standards and competitive market structure for cellular
service."  An Inquiry into the Use of the Bands 825-845 MHz and
870-890 MHZ for Cellular Communications Systems, 86 F.C.C.2d 469,
at ¶ 82 (April 9, 1981).  The FCC established minimum technical
standards including standards for height and power limitations
for base stations, the effective radiated power of mobile units,

_____

instrumentality thereof may regulate the placement, construction,
and modification of personal wireless service facilities on the
basis of the environmental effects of radio frequency emissions
to the extent that such facilities comply with the Commission's
regulations concerning such emissions."  Section
332 (c)(7)(B)(iv).

[15] The Carriers also rely on a brief submitted by the FCC in
support of defendants to several causes of action brought in the
Superior Court for the District of Columbia by cell phone users
alleging they incurred injuries as a result of RF radiation
emitted by handheld wireless telephones.  Pls. Mem. [Doc. 26]
Appendix at Tab 4.  While that brief has been helpful to this
Court, it pertained to the environmental effects of RF emissions
and not to the sort of local regulation at issue here.

intersystem compatibility, and interconnectedness with the
telephone network.  Id. at ¶¶ 86, 89, 92, 94.[16]

Upon numerous petitions for reconsideration of that report,
the FCC later affirmed its "preemption over the technical
standards for cellular systems," stating that it was "imperative
that no additional requirements be imposed by the states which
could conflict with [the FCC's] standards and frustrate the
federal scheme for the provision of nationwide cellular service."
An Inquiry into the Use of the Bands 825-845 MHz and 870-890 MHZ
for Cellular Communications Systems, 89 F.C.C.2d 58, at ¶ 81
(February 25, 1982).  See also An Inquiry Relative to the Future
Use of the Frequency Band 806-960 MHz, 46 F.C.C.2d 752 (May 1,
1974) (asserting "Federal primacy" over "the allocation of
frequency spectrum in the 806-947 MHZ band to the land mobile
radio service and to the development of regulations pertaining to
the future use of that spectrum." (emphasis added)).  Because

---

[16] The FCC explained:

> Our licensing scheme requires assurance that the 40 MHZ of
> radio spectrum allocated for cellular service is used
> effectively and efficiently.  The technical standards set
> forth in this Report and Order are the minimum standards
> necessary to achieve the desired goals and any state
> licensing requirements adding to or conflicting with them
> could frustrate federal policy. Similarly, any state
> franchising regulations requiring demonstration of a general
> public need for cellular service could adversely affect our
> frequency allocation scheme or delay the rapid
> implementation of cellular service, both of which are
> central elements of the federal design for cellular
> operations.

An Inquiry into the Use of the Bands 825-845 MHz and 870-890 MHZ
for Cellular Communications Systems, 86 F.C.C.2d 469, at ¶ 82.

these reports all were issued before 1996, and because Congress
in 1996 expressly ordered that any "pending Commission rulemaking
concerning the preemption of local zoning authority over the
placement, construction or modification of CMS [commercial mobile
services] facilities should be terminated," H.R. Conf. Rep. No.
104-458, at 209, this Court accords them little weight.

Having concluded that the provisions legislating a
preference for alternate technologies interfere with a field
completely occupied by Federal law, the Court need not address
the Carriers' argument that Chapter 251 "conflicts with and
frustrates valid policy decisions made by the FCC pursuant to its
exclusive regulatory authority." Pls. Reply at 10.

3.  Signal Strength Provisions

The Carriers next contend that Chapter 251 improperly
dictates "what constitutes adequate radio signal strength." Pls.
Mem. at 39. They point to section 251-13(A)(12), which requires
pre-applications to contain current signal propagation or
coverage maps showing "the in-vehicle coverage model"[17] for a
proposed site (including a map showing estimated coverage at -84
dBm or lower), and section 251-19(F)(27), which requires
applicants other than those in Category A to submit with their
formal applications propagation studies using the in-vehicle
model. The Carriers argue that these provisions are not only
ineffective, because no correlation has been established between

---

[17] The in-vehicle model measures the strength of reception
in a vehicle as opposed to in a building.

26

a particular signal strength and the ability of users to obtain services, but also are expressly preempted by 47 U.S.C. § 332(c)(7)(B)(i)(I), which prohibits local regulation from "unreasonably discriminat[ing] among providers of functionally equivalent services." Pls. Reply 15. They insist that Chapter 251's "one-size-fits-all requirement" disproportionately impacts those services that require a higher signal level. Id. They further contend that provisions impliedly are preempted because they "conflict[] directly with the federal government's regulatory scheme," Pls. Reply at 13, and "intrude[] upon the federal government's occupation of the entire field of wireless technical standards." Id. at 10.

The Town responds that, first, Chapter 251 does not legislate a certain adequate reception level but rather merely establishes a "baseline for review and comparison" of applications, and second, it merely requires an applicant to submit the same documentation and information that would have been required under 47 U.S.C. § 332(c)(7)(B)(i)(II) to prove a coverage gap (and therefore effective prohibition) with respect to an individual permit application. Because, it contends, a provider's failure to support its claim of a gap would be a legitimate ground to deny an application in the absence of Chapter 251, "it simply cannot be unlawful for a local wireless siting law to require that very same 'documentation' and information as an express part of the application process itself." Town Mem. at 37; Town Reply at 19 & n.7.

27

In light of the Court's conclusion, discussed below, that Chapter 251 must be invalidated as a whole, it need not resolve this issue. In brief, however, the provisions pertaining to coverage maps are not "regulation": they do not impose requirements on wireless carriers that conflict with federal objectives or intrude on a preempted field. Rather, as Jose C. Simoes, the Town Planner, explains, they have an administrative basis: "[f]or the sake of consistency and objectivity, and so that differing applications can be compared in a meaningful fashion." Simoes Declaration [Doc. 30, Attachment 9] at ¶ 15.

## B. Express Preemption

Having determined that Chapter 251 is unconstitutional, the Court need not reach the Carriers' express preemption arguments. The issue having been briefed and considered fully, however, the Court ought rule. The Carriers contend that Chapter 251 is expressly preempted by two provisions of the Telecommunications Act: section 332(c)(7)(B)(iv), which expressly forecloses local regulation of the environmental effects of wireless facilities that comply with the FCC's Radio Frequency (RF) emissions requirements, and section 253(a), which provides: "No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service."

1.     Environmental Effects of Radio Frequency
All transmitting facilities must comply with RF exposure

28

limits established by the FCC. See 47 C.F.R. § 1.1310.
Applications to the FCC for, inter alia, construction permits,
licenses to transmit, and equipment authorizations typically must
be accompanied by a statement, and supporting technical
information, confirming compliance with the FCC's exposure
limits. See 47 C.F.R. § 1.1307. The FCC has determined,
however, that certain facilities, due to their low power or their
height above ground level, are highly unlikely to cause human
exposure in excess of the guideline limits. Generally speaking,
these include tower-mounted antennas placed more than ten meters
above ground and rooftop antennas transmitting at less than 1000
watts. See 47 C.F.R. § 1.1307(b). Such facilities are
"categorically excluded" from the requirement for routine
determination of RF exposure. Id. The licensees, however,
remain responsible for compliance, and the FCC, on its own motion
or on behalf of an "interested person," may require any licensee
to determine a facility's compliance. Id. at (c) and (d). These
regulations have been upheld as neither arbitrary nor capricious.
See Cellular Phone Taskforce v. FCC, 205 F.3d 82, 95-96 (2d Cir.
2000).

The Telecommunications Act expressly imposes substantive
limits on a local government's regulation with respect to RF
exposure, providing: "No State or local government or
instrumentality thereof may regulate the placement, construction,
and modification of personal wireless service facilities on the
basis of the environmental effects of radio frequency emissions

29

to the extent that such facilities comply with the Commission's regulations concerning such emissions." 47 U.S.C. § 332(c)(7)(B)(iv). If, as the Carriers contend, Chapter 251 regulates the location of facilities that comply with the FCC's RF standards "on the basis of the[ir] environmental effects," it is preempted.

Several provisions of Chapter 251 demand information pertaining to RF emissions. Section 251-19(F) requires applications in categories B, C, and D to include information pertaining to the radiated power of any proposed antenna, id. at (20), to certify that the "non-ionizing electromagnetic radiation (NIER) levels at the proposed sites be within the threshold levels adopted by the FCC," id. at (23), and to provide a "RF report," id. For proposals "in which public exposure [to NIER] is likely," applications must contain an "assessment of potential public exposure to radio frequency (RF) energy from the proposed facility," identifying the "maximum exposure level, the locations at which this occurs, the estimated RF levels at specific locations of community interest, . . . and the applicable maximum levels allowed by federal and state laws." Section 251-23 (A). Another section establishes how "NIER levels shall be measured and calculated," see section 251-24 (E), and provides that the measurements and calculations must be certified by a state-licensed engineer or physicist. Id. at (H).

The Carriers contend that the Town improperly would use the information about RF emissions in its siting decisions, and, even

30

if it did not, the "comprehensiveness of these requirements and
the fact that they are mandatory . . . amount to a 'regulation'
of the operation of wireless facilities." Pls. Mem. at 46-47.
With respect to the latter argument, because the FCC has not
mandated any procedure by which localities must determine
compliance with its requirements, there can be no serious dispute
but that the Town may require applicants to submit information
pertaining to RF emissions in order to determine whether the FCC
standards are met, i.e., it may require more than a statement of
compliance. The Carriers contend, however, that Chapter 251's
provisions are "vastly more intrusive than anything the FCC
requires," Pls. Reply 19, and argue that the Town should have
employed a "two page checklist" circulated by the FCC with a
guide for local officials for determining whether proposed
wireless facilities present compliance concerns or whether they
are "categorically excluded." See Federal Communications
Commission, A Local Government Official's Guide to Transmitting
Antenna RF Emission Safety: Rules, Procedures, and Practical
Guidance (2000) ("the Guide") [Doc. 34 Attachment 1]. The
checklist is included with the Guide as Appendix A.

The Guide states that it is "voluntary," id. at
Introduction, and that use of the checklist "is not mandatory."
Id. at 8. Review of the Guide and accompanying checklist,
however, leads this Court to conclude that the information
required by Chapter 251 goes far beyond what would be necessary
for determination by the Town that a facility complies with the

31

FCC's exposure limits, particularly with respect to facilities not mounted on buildings. The only information necessary to determine whether a tower-mounted antenna is "categorically excluded" from the FCC compliance determination is whether the lowest point of the antenna will be at least ten meters above the ground. Id. at app. A. Instead, for new towers, Chapter 251 requires a report by a Planning Board-qualified engineer or physicist calculating the maximum amount of radiation to be emitted and demonstrating that the facility will comply with federal standards. See Chapter 251, § 251-22(B). The Court is not convinced, however, that merely requesting this information is impermissible "regulation" of the siting of wireless facilities based on their environmental effects, and the Carriers have pointed to no authority so holding.

If the Town were to use information about RF emissions to make siting decisions, however, its regulation would be preempted. In support of their argument that Chapter 251 contemplates such conduct, the Carriers point to Table 1 of Chapter 251 -- the Preliminary Site Screening Tool used by the Planning Board to categorize applications. One criteria, titled "Potential aesthetic and safety impacts on public assembly," awards more points to applications for facilities based on increased distances from schools and day-care facilities. Id. An application receives maximum points for being more than 1000 feet away, half for being between 500 and 1000 feet away, and none for being within 500 feet. Id. There is an absolute

32

prohibition on facilities within 350 feet. See section 251-
29(B). The Carriers, noting that towers usually stand 80 to 150
feet above ground level, contend that "it is obvious from the
distances involved that the 'safety impacts' contemplated are
related to RF emissions rather than potential damage from a
tower's collapse." Pls. Reply 18. If that is accurate, the
provision would be preempted. The Town justifies the provision
as protecting against injury caused by the "live wires and the
structures themselves," Town Mem. at 51, which it argues is
distinctly the province of local building, zoning, and land use
controls. Its regulation in this regard is entitled to the
presumption against preemption.

    2.    Prohibition of the Provision of Wireless Services

    The parties debate at some length as to which of the
following provisions of the Telecommunications Act applies to the
Carriers' facial challenge: 47 U.S.C. § 332(c)(7)(B)(i)(II),
which, as discussed above, pertains only to wireless services, or
47 U.S.C. § 253(a), which provides: "No State or local statute or
regulation, or other State or local legal requirement, may
prohibit or have the effect of prohibiting the ability of any
entity to provide any interstate or intrastate telecommunications
service." The underlying assumption in this extensively-briefed
debate is that the legal standards under section 253(a) and
section 332(c)(7)(B)(i)(II) are different, an issue not yet
addressed by the Second Circuit, and that analysis under
section 253(a) would be more favorable to the Carriers. In light

33

of a recent, persuasive decision by the Ninth Circuit Court of Appeals, which was released after the briefs were filed in this case, this Court need not decide which provision applies because the Court agrees with the Ninth Circuit that the legal standards are the same: whether a challenged regulation prohibits or effectively prohibits the provision of wireless services. See Sprint Telephony PCS, L.P. v. County of San Diego, 490 F.3d 700 (9th Cir. 2007), rev'd en banc, 543 F.3d 571 (9th Cir. 2008).

In Sprint Telephony, a wireless carrier asked a district court permanently to enjoin the County of San Diego from enforcing an ordinance imposing restrictions and permit requirements on the construction and location of wireless telecommunications facilities. 543 F.3d at 574. Similar to Chapter 251, the ordinance "categorized applications for wireless telecommunications facilities into four tiers, depending primarily on the visibility and location of the proposed facility." Id. The ordinance "impose[d] substantive and procedural requirements on applications," including prohibiting non-camouflage poles in residential zones, imposing certain height and setback restrictions in those zones, and restricting the number of facilities on any site. Id. Like here, the ordinance required an applicant to provide various pieces of information to a board, required the board to hold a public hearing before granting any permit, and permitted the board to deny permit applications or grant them conditionally. Id. at 574-75. As in this case, the parties disagreed about whether the

34

court should apply section 253 or 332.  The Ninth Circuit Court of Appeals concluded that the legal standards under the two sections were "the same" and concluded that the wireless carrier failed its "high burden" of proving that the San Diego ordinance was facially unconstitutional.  Id. at 579-80.[18]

Does Chapter 251 effectively prohibit the provision of wireless services?[19]  The Carriers contend that the answer is "yes," arguing that Chapter 251 imposes burdensome application requirements and "unlimited delays," vests the Town with "unbounded discretion" to deny or impose any conditions on its approval of applications, and "flatly prohibit[s] new wireless

---

[18] In reaching that conclusion, the court explicitly overruled its earlier broad interpretation of section 253(a) -- namely, that it prohibited any regulation that "might possibly" prohibit the provision of services, i.e., any regulation that "merely creates a substantial barrier" to the provision of services.  Sprint Telephony, 543 F.3d at 578.  The Ninth Circuit pointed to the Second Circuit's decision in TCG N.Y., Inc. v. City of White Plains, 305 F.3d 67, 76 (2d Cir. 2002) as an example of the "far-reaching consequences" of the Ninth Circuit's broad interpretation of section 253(a), describing TCG N.Y. as a case that had "followed" that interpretation.  Sprint Telephony, 543 F.3d at 577.  In TCG N.Y., Inc., the Second Circuit concluded that a city's franchising ordinance setting forth a process by which carriers could gain approval to place equipment in the city's rights-of-way violated section 253(a) because it prohibited the plaintiff (non-wireless) telecommunications carrier from providing services.  305 F.3d at 81-82.  Contrary to the suggestion by the Ninth Circuit, however, the court did not adopt a "possible prohibition" standard.  It merely explained that a prohibition need not be "complete or insurmountable to run afoul of section 253(a)," and that in the Second Circuit courts must apply the FCC standard: "whether the ordinance materially inhibits or limits the ability of any competitor or potential competitor to compete in a fair and balanced legal and regulatory environment."  Id. at 76 (quoting Cal. Payphone Ass'n, 12 F.C.C.R. 14191, 1997 WL 400726, at ¶ 31 (1997)).

[19] Chapter 251 plainly is not an outright ban on wireless facilities.

35

facilities in large portions of the Town." Pls. Mem. 11.   The
Court is not persuaded.

                 a.    The Application Requirements and Delays

The Carriers have pointed to no procedural requirement that,
on its face, effectively prohibits them from providing wireless
services.  As the Town points out, other than the forty-five days
leading up to the categorization of each formal application,
Chapter 251 imposes waiting periods -- sixty-two days plus sixty-
two days -- equivalent to the Town's traditional zoning
applications.  See N.Y. Town Law § 274-b(6).  This plainly
fulfills the Telecommunications Act's mandate that local boards
"shall act on any request . . . within a reasonable period of
time," 47 U.S.C. § 332(c)(7)(B)(ii).  Given the facial nature of
the challenge here, and the corresponding lack of any actual
delay for the Court to examine, the Carriers' argument that the
Town may "indefinitely delay action on an application," Pls. Mem.
18, is too speculative.

                 b.    The Board's Discretion

Much of the Carriers' animus is directed towards what it
characterizes as the "broad, standardless discretion" that
Chapter 251 confers on the Planning Board in determining the
completeness of applications, their categorization, the hiring
and payment of consultants, and the ultimate rejection of
applications.  Pls. Mem. 24-25.  The 2008 Sprint Telephony en
banc decision, however, weighs heavily against them.  There,
Sprint complained about the discretion reserved to a zoning

board, arguing that it allowed the board to consider "open-ended
concepts" like community character and aesthetics, and that it
permitted the board to impose almost any condition deemed
appropriate. The Ninth Circuit rejected Sprint's challenge,
explaining that "[a] certain level of discretion is involved in
evaluating any application for a zoning permit." 543 F.3d at
580. While the Ninth Circuit acknowledged that "a zoning board
could exercise its discretion to effectively prohibit the
provision of wireless services," it observed that "it is equally
true (and more likely) that a zoning board would exercise its
discretion only to balance the competing goals of an ordinance."
Id.

The Carriers find some support in a Second Circuit decision
pertaining to a board's discretion, albeit one not involving a
facial challenge. In TCG New York, Inc. v. City of White Plains,
305 F.3d 67, 76-77 (2d Cir. 2002), a rights-of-way franchise
ordinance gave a local board the right to reject any application
based on any "public interest factors . . . that are deemed
pertinent by the City." The court concluded that the provision
"amounts to a right to prohibit providing telecommunications
services," which, when coupled with extensive processing delays
that occurred during the city's processing of the plaintiff's
request for a franchise, had interfered with the carrier's
ability to compete in violation of section 253(a).

Similarly, in TC Systems, Inc. v. Town of Colonie, New York,
263 F. Supp. 2d 471, 483 (N.D.N.Y. 2003), the Northern District

37

of New York held that a town's ordinance requiring
telecommunications service providers to enter into franchise
agreements had the effect of prohibiting the provision of
telecommunications services, concluding that "[n]umerous
provisions  . . . give the Town the option of prohibiting
telecommunications services by a particular provider."
Specifically, the court invalidated the subsections that
permitted the municipality, in consideration of granting a
franchise, broadly to "consider such factors as it deems
appropriate and in the public interest"; to consider legal,
financial and technical qualifications of the applicant; and to
impose various disclosures, reporting, and record keeping
requirements. Id. at 485-87.

The Town characterizes these and other franchise agreement
cases relied upon by the Carriers as "inapposite." Town Mem. 11.
As discussed above, however, these section 253(a) cases inform
the Court's determination of whether Chapter 251 does "prohibit
or have the effect of prohibiting" the provision of wireless
services. While there is no question that in TCG New York, Inc.,
the Second Circuit was less tolerant of a board's discretion than
was the Ninth Circuit more recently in Sprint Telephony, the TCG
New York, Inc. court seemed particularly troubled by the
combination of the city's discretionary authority and its
"extensive delays" in processing the provider's franchise
applications. Here, where there is a facial challenge and thus
no proven delay, TCG New York, Inc. is distinguishable.

Furthermore, the cases involving franchise applications differ from the circumstances here because they involve the very entry of an entire carrier into a market rather than the construction of a certain facility on a specific site.

          c.   Prohibition of Structures in Certain Areas

Finally, the Carriers contend that because Chapter 251 prohibits new structures from being built within 350 feet of a day care center, school, camp, public park, or playground, it "unequivocally prevents such facilities from being constructed in many areas of the Town, which is itself a prohibition under Section 253." Pls. Mem. 29. They have failed to show, however, that due to the number and location of schools and parks, the requirement constitutes an effective prohibition. While provisions preventing a wireless provider from closing a significant gap in service coverage could amount to an effective prohibition, see Sprint Spectrum v. Willoth, 176 F.3d 630, 643 (2d Cir. 1999), the Carriers have made no such showing.

**C.   Severability of the Preempted Provisions**

Having ruled Chapter 251 preempted in several respects, the Court next must determine "whether the invalid portions of the statute can be severed from the valid portions so the remainder of the statute can be preserved." National Advertising Co. v. Town of Niagara, 942 F.2d 145, 148 (2d Cir. 1991) (ruling sign ordinance unconstitutional and severance inappropriate where striking eleven provisions would leave large gaps in the ordinance, notwithstanding the general severance provision). The

39

Court "should refrain from invalidating an entire statute when only portions of it are objectionable." Id. The preference for severance is "particularly strong" when, as here, the law contains a severability clause, see chapter 251 § 251-43, but the presence of such a clause "is not dispositive." National Advertising Co., 942 F.2d at 148; see also United States v. Jackson, 390 U.S. 570, 585 n.27 (1968) (the ultimate determination of severability will rarely turn on the presence or absence of a severability clause).

Severability is a question of state law. Id. Under New York law, severance is appropriate only when the legislative body, foreseeing the partial invalidity, would have intended the provision to be severed, and when the remaining provisions can function as a coherent whole. See Alpha Portland Cement Co. v. Knapp, 230 N.Y. 48, 60 (1920) ("[W]hether the Legislature, if partial invalidity had been foreseen, would have wished the statute to be enforced with the invalid part exscinded, or rejected altogether. The answer must be reached pragmatically, by the exercise of good sense and sound judgment, by considering how the statutory rule will function if the knife is laid to the branch instead of at the roots."). The Second Circuit, applying New York law, has explained that "severance is inappropriate when the valid and invalid provisions are so intertwined that excision of the invalid provisions would leave a regulatory scheme that the legislature never intended." National Advertising Co., 942 F.2d at 148.

40

The Court must answer the following question: what is the effect of severing the provisions pertaining to RF interference and alternate technologies? While Chapter 251 may be able to stand upon severance of the provisions pertaining to RF interference, and even certain of the provisions concerning alternate technologies, see section 251-10E (declaring a preference for alternate technologies); section 251-19(G)(9) (requiring Category D applications to submit a report justifying failure to use alternate technologies), the entire sorting scheme established by section 251-15 (A) would be rendered meaningless by severance of its expressed preference for alternate technologies. First, section 251-15 (A)((1) establishes an entire category, "A," for pre-applications that use a "preferred alternate technology" or locate on an existing site, and have an acceptable corresponding minimum screening value. Even were the Court to strike that provision, the preliminary site screening tool includes a criterion labeled "installation type," which assigns a score of five for new towers, ten for existing structures, and thirty for alternate technologies. See Chapter 251 Table 1. The total screening value for each pre-application determines its category assignment, with a higher value earning a more preferable category. In light of the pervasive preference for alternate technologies, this Court cannot determine with certainty that the Planning Board intended this statute enforced absent these provisions.

41

## III. CONCLUSION

As discussed above, portions of Chapter 251 are preempted by federal law.  This Court is "particularly hesitant to undertake revisions of the ordinance in light of the fact that [this Court is] a federal court interpreting a local ordinance."  National Advertising Co., 942 F.2d at 151 (citing Brockett v. Spokane Arcades, Inc., 472 U.S. 491, 508 (1985) (O'Connor, J., concurring)).  Were this Court convinced that Chapter 251 were capable of being administered in a "fair, coherent, and equitable manner" minus the unconstitutional provisions, id., it would give full effect to Chapter 251's severance clause.  Severance of the invalid provisions, however, would create a confusing and unworkable statute, and Chapter 251 must be redrafted in its entirety to effectuate the Town's policies consonant with federal law.

The Town is afforded six months from the date of this decision to effectuate such a re-draft.  Any further time will constitute an impermissible total ban on the provision of personal wireless services.

SO ORDERED.

William G. Young
United States District Judge

Dated:
March 26, 2009